Philip D. Stern
Andrew T. Thomasson
STERN•THOMASSON LLP
150 Morris Avenue, 2nd Floor
Springfield, NJ 07081-1329
(973) 379-7500

*Attorneys for Plaintiff and all others similarly situated*

UNITED STATES DISTRICT COURT
DISTRICT OF NEW JERSEY

| | |
|---|---|
| MEDICINE TO GO PHARMACIES, INC. on behalf of plaintiff and the class members defined herein, | ) ) ) ) |
| Plaintiff, | ) ) |
| vs. | ) ) |
| IMPAX LABORATORIES, INC., and JOHN DOES 1-10, | ) ) ) |
| Defendants. | ) ) |

## COMPLAINT – CLASS ACTION

### INTRODUCTION

1. Plaintiff Medicine To Go Pharmacies, Inc., brings this action to secure redress for the actions of defendant Impax Laboratories, Inc. ("Impax") in sending or causing the sending of unlawful advertisements to telephone facsimile machines in violation of the Telephone Consumer Protection Act, 47 U.S.C. §227 ("TCPA").

### PARTIES

2. Plaintiff Medicine To Go Pharmacies, Inc. is a corporation with offices at 528 West Lacey Road, Forked River, New Jersey 08731, where it maintains telephone facsimile equipment.

1

3. Defendant, Impax Laboratories Inc., is a Delaware corporation that has offices at 30831 Huntwood Avenue, Hayward, California 94544.

4. Defendants John Does 1-10 are other natural or artificial persons that were involved in the sending of the facsimile advertisements described below. Plaintiff does not know who they are.

## JURISDICTION AND VENUE

5. This Court has jurisdiction under 28 U.S.C. §§1331 and 1367. *Mims v. Arrow Financial Services, LLC*, 132 S. Ct. 740, 751-53 (2012).

6. Venue in this District is proper for the same reason.

## FACTS

7. On December 21, 2016, plaintiff Medicine To Go Pharmacies, Inc., received the fax advertisement attached as Exhibit A on its facsimile machine.

8. Discovery may reveal the transmission of additional faxes as well.

9. Impax is responsible for sending or causing the sending of the fax.

10. Impax, as the entity whose products or services were advertised in the fax, derived economic benefit from the sending of the fax.

11. Impax either negligently or wilfully violated the rights of plaintiff and other recipients in sending the fax.

12. The fax does not contain an opt-out notice that complies with 47 U.S.C. §227.

13. The TCPA makes unlawful the "use of any telephone facsimile machine, computer or other device to send an unsolicited advertisement to a telephone facsimile machine ..." 47 U.S.C. §227(b)(1)(C).

14. The TCPA provides for affirmative defenses of consent or an established business relationship. Both defenses are conditioned on the provision of an opt out notice that complies with the TCPA. *Holtzman v. Turza*, 728 F.3d 682 (7th Cir. 2013); *Nack v. Walburg*, 715 F.3d 680 (8th Cir. 2013).

15. On information and belief, the faxes attached hereto were sent as part of a mass broadcasting of faxes.

16. On information and belief, defendants have transmitted similar fax advertisements to at least 40 other persons in this District.

17. There is no reasonable means for plaintiff or other recipients of defendants' advertising faxes to avoid receiving illegal faxes. Fax machines must be left on and ready to receive the urgent communications authorized by their owners.

### COUNT I – TCPA

18. Plaintiff incorporates ¶¶ 1-17.

19. The TCPA, 47 U.S.C. §227(b)(3), provides:

> **Private right of action.**
>
> **A person or entity may, if otherwise permitted by the laws or rules of court of a State, bring in an appropriate court of that State–**
>
> > **(A) an action based on a violation of this subsection or the regulations prescribed under this subsection to enjoin such violation,**
> >
> > **(B) an action to recover for actual monetary loss from such a violation, or to receive $500 in damages for each such violation, whichever is greater, or**
> >
> > **(C) both such actions.**
>
> **If the Court finds that the defendant willfully or knowingly violated this subsection or the regulations prescribed under this subsection, the court may, in its discretion, increase the amount of the award to an amount equal to not more than 3 times the amount available under the subparagraph (B) of this paragraph.**

20. Plaintiff and each class member suffered damages as a result of receipt of the faxes, in the form of paper and ink or toner consumed as a result. Furthermore, plaintiff's statutory right of privacy was invaded.

21. Plaintiff and each class member is entitled to statutory damages.

22. Defendants violated the TCPA even if their actions were only negligent.

23. Defendants should be enjoined from committing similar violations in the future.

## CLASS ALLEGATIONS

24. Pursuant to Fed. R. Civ .P. 23(a) and (b)(3), plaintiff brings this claim on behalf of a class, consisting of (a) all persons (b) who, on or after a date four years prior to the filing of this action (28 U.S.C. §1658), (c) were sent faxes by or on behalf of defendant Impax Laboratories, Inc., promoting its goods or services for sale (d) which do not contain an "opt out" notice in the form required by 47 U.S.C. §227.

25. The class is so numerous that joinder of all members is impractical. Plaintiff alleges on information and belief that there are more than 40 members of the class.

26. There are questions of law and fact common to the class that predominate over any questions affecting only individual class members. The predominant common questions include:

    a. Whether defendants engaged in a pattern of sending unlawful fax advertisements; and

    b. Whether defendants thereby violated the TCPA.

27. Plaintiff will fairly and adequately protect the interests of the class. Plaintiff has retained counsel experienced in handling class actions and claims involving unlawful business practices. Neither plaintiff nor plaintiff's counsel have any interests which might cause them not to vigorously pursue this action.

28. Plaintiff's claims are typical of the claims of the class members. All are based on the same factual and legal theories.

29. A class action is the superior method for the fair and efficient adjudication of this controversy. The interest of class members in individually controlling the prosecution of separate claims against defendants is small because it is not economically feasible to bring individual actions.

30. Several courts have certified class actions under the TCPA. *City Select Auto Sales, Inc. v David Randall Associates, Inc.* 296 F.R.D. 299 (D.N.J. 2013); *Holtzman v. Turza*, 08

C 2014, 2009 WL 3334909, 2009 U.S. Dist. LEXIS 95620 (N.D.Ill., Oct. 14, 2009), aff'd in relevant part, 728 F.3d 682 (7th Cir. 2013); *Sadowski v. Med1 Online, LLC,* 07 C 2973, 2008 WL 2224892, 2008 U.S. Dist. LEXIS 41766 (N.D.Ill., May 27, 2008); *CE Design Ltd. v Cy's Crabhouse North, Inc.*, 259 F.R.D. 135 (N.D.Ill. 2009); *Targin Sign Sys. v Preferred Chiropractic Ctr., Ltd.*, 679 F. Supp. 2d 894 (N.D.Ill. 2010); *Garrett v. Ragle Dental Lab, Inc.,* 10 C 1315, 2010 U.S. Dist. LEXIS 108339, 2010 WL 4074379 (N.D.Ill., Oct. 12, 2010); *Hinman v. M & M Rental Ctr.,* 545 F.Supp. 2d 802 (N.D.Ill. 2008); *Clearbrook v. Rooflifters, LLC*, 08 C 3276,  2010 U.S. Dist. LEXIS 72902 (N.D. Ill. July 20, 2010) (Cox, M.J.); *G.M. Sign, Inc. v. Group C Communs., Inc.*, 08 C 4521, 2010 WL 744262, 2010 U.S. Dist. LEXIS 17843 (N.D. Ill. Feb. 25, 2010); *Kavu, Inc. v. Omnipak Corp.,* 246 F.R.D. 642 (W.D.Wash. 2007); *Display South, Inc. v. Express Computer Supply, Inc.,* 961 So.2d 451, 455 (La. App. 1$_{st}$ Cir. 2007); *Display South, Inc. v. Graphics House Sports Promotions, Inc.*, 992 So. 2d 510 (La. App. 1$_{st}$ Cir. 2008); *Lampkin v. GGH, Inc.*, 146 P.3d 847 (Ok. App. 2006); *ESI Ergonomic Solutions, LLC v. United Artists Theatre Circuit, Inc.*, 203 Ariz. (App.) 94, 50 P.3d 844 (2002);  *Core Funding Group, LLC v. Young*, 792 N.E.2d 547 (Ind.App. 2003); *Critchfield Physical Therapy v. Taranto Group, Inc.*, 293 Kan. 285; 263 P.3d 767 (2011); *Karen S. Little, L.L.C. v. Drury Inns. Inc.,* 306 S.W.3d 577 (Mo. App. 2010).

      31.    Management of this class action is likely to present significantly fewer difficulties that those presented in many class actions, e.g. for securities fraud.

      WHEREFORE, plaintiff requests that the Court enter judgment in favor of plaintiff and the class and against defendants for:

    a.    Actual damages;

    b.    Statutory damages;

    c.    An injunction against the further transmission of unlawful fax advertising;

    d.    Costs of suit;

    e.    Such other or further relief as the Court deems just and proper.

DATED:       February 14, 2017

                                                                                                         STERN•THOMASSON LLP
*Representing Plaintiff, Medicine to Go Pharmacies, Inc. and all others similarly situated*

*s/ Andrew T. Thomasson*
Andrew T. Thomasson

## CERTIFICATION PURSUANT TO LOCAL CIVIL RULE 11.2

I, Andrew T. Thomasson, hereby certify that to the best of my knowledge that the matter in controversy is <u>not</u> the subject of any other action pending in any court, or of any pending arbitration or administrative proceeding.

DATED: February 14, 2017

                                                 STERN•THOMASSON LLP
*Representing Plaintiff, Medicine to Go Pharmacies, Inc. and all others similarly situated*

*s/ Andrew T. Thomasson*
Andrew T. Thomasson

## NOTICE OF ASSIGNMENT

      Please be advised that all rights relating to attorney's fees have been assigned to counsel.

    DATED:     February 14, 2017

                                                     STERN•THOMASSON LLP
                                                     *Representing Plaintiff, Medicine to Go Pharmacies, Inc. and all others similarly situated*

                                                     *s/ Andrew T. Thomasson*
                                                     Andrew T. Thomasson

## DOCUMENT PRESERVATION DEMAND

Plaintiffs hereby demand that each defendant take affirmative steps to preserve all recordings, data, documents, and all other tangible things that relate to plaintiffs, the events described herein, and any account or number or symbol relating to them. These materials are likely very relevant to the litigation of this claim. If defendants are aware of any third party that has possession, custody, or control of any such materials, plaintiffs demand that defendants request that such third party also take steps to preserve the materials. This demand shall not narrow the scope of any independent document preservation duties of the defendants.

DATED:     February 14, 2017

STERN•THOMASSON LLP
*Representing Plaintiff, Medicine to Go Pharmacies, Inc. and all others similarly situated*


*s/ Andrew T. Thomasson*
Andrew T. Thomasson

# EXHIBIT A



**Affordable, easy-to-use[1] Impax Epinephrine Auto-injector.**

Make the epinephrine auto-injector (EAI) from Impax* your **GO-TO-CHOICE** for the emergency treatment of allergic reactions (Type I) including anaphylaxis.

- FDA-approved, low-cost choice
- Contains epinephrine, the same active medicine as EpiPen®
- Impax EAI can be substituted for EpiPen® in 21 states by the pharmacist. In all other states, patients or pharmacists can request a prescription from the physician for Impax EAI
- $0 Copay Card available at www.epinephrineautoinject.com
- Readily available to ship immediately from your wholesaler or distributor



| Impax Epinephrine Auto-injector | 0.15mg, Two-Pack for patients 33-66 lbs. | 0.3mg, Two-Pack for patients >66 lbs. |
|---|---|---|
| NDC | 54505-0101-02 | 54505-0102-02 |

| Wholesaler Order Numbers | 0.15mg, Two-Pack for patients 33-66 lbs. | 0.3mg, Two-Pack for patients >66 lbs. |
|---|---|---|
| AmerisourceBergen | 10118067 | 10118068 |
| Cardinal Health | 4884458 | 4884508 |
| McKesson | 1990647 | 1990654 |

*Authorized generic of Adrenaclick (epinephrine injection, USP) Auto-Injector
EpiPen is a registered trademark of Mylan Inc. licensed exclusively to its wholly-owned subsidiary, Mylan Specialty L.P.
Adrenaclick trademark is registered in the name of Amedra Pharmaceuticals, which is wholly owned by Impax Laboratories, Inc.



©2016 Impax Laboratories, Inc. All rights reserved. PP-ADO-EAI-US-0006 October 2016

**Epinephrine Injection, USP Auto-Injector**

**Important Safety Information**

**Indications and Usage**
The epinephrine injection, USP auto-injector is indicated in the emergency treatment of allergic reactions (Type I) including anaphylaxis to stinging insects and biting insects, allergen immunotherapy, foods, drugs, diagnostic testing substances, and other allergens, as well as idiopathic anaphylaxis or exercise-induced anaphylaxis.

**Warnings and Precautions**

**Emergency Treatment:** The epinephrine injection, USP auto-injector is intended for immediate administration as emergency supportive therapy and is not intended as a substitute for immediate medical care. **In conjunction with the administration of epinephrine, the patient should seek immediate medical or hospital care.** More than two sequential doses of epinephrine should only be administered under direct medical supervision.

**Incorrect Locations of Injection:** The epinephrine injection, USP auto-injector should **ONLY** be injected into the anterolateral aspect of the thigh. **Do not inject intravenously.** Large doses or accidental intravenous injection of epinephrine may result in cerebral hemorrhage due to a sharp rise in blood pressure. Rapidly acting vasodilators can counteract the marked pressor effects of epinephrine if there is such inadvertent administration. **Do not inject into buttock.** Injection into the buttock may not provide effective treatment of anaphylaxis. Advise the patient to go immediately to the nearest emergency room for further treatment of anaphylaxis. Injection into the buttock has been associated with the development of Clostridial infections (gas gangrene). Cleansing with alcohol does not kill bacterial spores, and therefore, does not lower the risk. **Do not inject into fingers, hands or feet.** Since epinephrine is a strong vasoconstrictor, accidental injection into the fingers, hands or feet may result in loss of blood flow to the affected area. Advise the patient to go immediately to the nearest emergency room and to inform the healthcare provider in the emergency room of the location of the accidental injection. Treatment of such inadvertent administration should consist of vasodilation, in addition to further appropriate treatment of anaphylaxis. **Hold leg firmly during injection.** Lacerations, bent needles, and embedded needles have been reported when epinephrine has been injected into the thigh of young children who are uncooperative and kick or move during an injection. To minimize the risk of injection related injury when administering epinephrine injection, USP auto-injector to young children, instruct caregivers to hold the child's leg firmly in place and limit movement prior to and during injection.

**Allergic Reactions Associated with Sulfite:** The presence of a sulfite in this product should not deter administration of the drug for treatment of serious allergic or other emergency situations even if the patient is sulfite-sensitive.

**Serious Infections at the Injection Site:** Rare cases of serious skin and soft tissue infections, including necrotizing fasciitis and myonecrosis caused by Clostridia (gas gangrene), have been reported at the injection site following epinephrine injection for anaphylaxis. Clostridium spores can be present on the skin and introduced into the deep tissue with subcutaneous or intramuscular injection.

**Disease Interactions:** Some patients may be at greater risk for developing adverse reactions after epinephrine administration. **Patients with Heart Disease.** Epinephrine should be administered with caution to patients who have heart disease, including patients with cardiac arrhythmias, coronary artery or organic heart disease, or hypertension. In such patients, or in patients who are on drugs that may sensitize the heart to arrhythmias, epinephrine may precipitate or aggravate angina pectoris as well as produce ventricular arrhythmias. **Other Patients and Diseases.** Epinephrine should be administered with caution to patients with hyperthyroidism, diabetes, elderly individuals, and pregnant women. Patients with Parkinson's disease may notice a temporary worsening of symptoms.

**Adverse Reactions**

Common adverse reactions to systemically administered epinephrine include anxiety; apprehensiveness; restlessness; tremor; weakness; dizziness; sweating; palpitations; pallor; nausea and vomiting; headache, and/or respiratory difficulties.

Arrhythmias, including fatal ventricular fibrillation, have been reported, particularly in patients with underlying cardiac disease or those receiving certain drugs. Rapid rises in blood pressure have produced cerebral hemorrhage, particularly in elderly patients with cardiovascular disease. Angina may occur in patients with coronary artery disease.

Accidental injection into the fingers, hands or feet may result in loss of blood flow to the affected area.

Adverse events experienced as a result of accidental injections may include increased heart rate, local reactions including injection site pallor, coldness and hypoesthesia or injury at the injection site resulting in bruising, bleeding, discoloration, erythema or skeletal injury.

Lacerations, bent needles, and embedded needles have been reported when epinephrine injection, USP auto-injector has been injected into the thigh of young children who are uncooperative and kick or move during an injection.

Injection into the buttock has resulted in cases of gas gangrene.

Rare cases of serious skin and soft tissue infections caused by Clostridia (gas gangrene), have been reported following epinephrine injection in the thigh.

**Use in Specific Populations**

Elderly patients may be at greater risk of developing adverse reactions.

**You are encouraged to report side effects of prescription drugs to the FDA.** Visit www.fda.gov/medwatch or call 1-800-FDA-1088.

For full prescribing information and video instructions on the use of the epinephrine injection, USP auto-injector, go to www.epinephrineautoinject.com or call 1-888-894-6528.

**Reference: 1.** Data on file, Impax Labs: AdrenaClick Auto-Injector Formal Summative Study Report, Human Factors Use Model Comparison Study (Human Factors Testing of Adolescents 12 to 18 Years of Age and Adults) (Protocol AM-14-001 v2.1), 2014.